**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 25-cr-184-WJM

UNITED STATES OF AMERICA,

 Plaintiff,

v.

**1. RAQUAN JOHNSON**,

 Defendant.

---

### ORDER GRANTING MOTION TO SUPPRESS

---

Late one night in May 2025, Aurora, Colorado police officers received information that a fight had broken out among several women at a residence and that one of the women—and then later a man—had possessed (but not used) a gun.  Four officers arrived at the parking lot of the residence and saw Defendant Raquan Johnson and two women sitting in a parked truck that was turned off.  The officers eventually removed Johnson from the truck, frisked him, and found a gun in his pants and other contraband in the truck.  The Government later learned that Johnson has prior felony convictions, so it charged him with one count of Possession of a Firearm and Ammunition by a Prohibited Person.  18 U.S.C. § 922(g)(1).  Johnson now asks ("Motion") the Court to suppress the evidence found on his person and in the truck because, in his view, the officers lacked reasonable suspicion to initially detain him and subsequently frisk him. (ECF No. 46.)

Johnson is right that the frisk was unlawful.  The officers may have reasonably suspected that at least one of the women in the truck had committed a crime at the residence.  The officers may have also reasonably suspected that Johnson was armed.  But the officers had no reasonable basis to suspect that Johnson was dangerous.  And before performing a frisk, the Fourth Amendment requires an officer to reasonably believe "that the suspect is *both* (1) armed, and (2) dangerous."  *United States v. House*, 463 Fed. Appx. 783, 788 (10th Cir. 2012) (emphasis in original).  Because the officers did not have reasonable suspicion to believe that Johnson was both armed *and* dangerous, the incriminating evidence seized from Johnson's person and the truck must be suppressed.

## I.    PERTINENT FACTS

Around 3:30 a.m. on May 4, 2025, Kamari Custis[1] called 911 to report that approximately four to seven men and women were guests in his home—which he shared with his father, Chris[2]—and that a fight had broken out among the women.  (Motion Exhibit 1 at 0:00–0:35.)  Custis explained to the dispatcher that the women were his father's friends.  He reported that a Hispanic woman in her 20s, wearing all black with blue and white shoes, had hit him and thrown him down the stairs.  (*Id.* at 4:15.)  Custis added that one of the women had pulled out a pistol but had not used it.  (*Id.* at 1:10–1:25.)  He then reported that the guests had left the home but were still near

---

[1] For some reason, the Computer Aided Dispatch ("CAD") notes refer to Custis as "Tamarus."

[2] The record does not appear to reveal what Chris's surname is, so the Court must refer to him by his first name.  The Court intends no disrespect in doing so.

the front door.  (*Id.* at 4:25–4:59.)  Custis told the dispatcher that the pistol was now with a "tall black male with dreads" who was wearing all black.  (*Id.* at 4:55–5:11.)  Shortly thereafter, Custis confirmed that all the guests had gone outside but noted that he did not "know what car they're in."  (*Id.* at 9:59–10:15.)  The 911 call was frantic and lasted approximately 12 minutes.  (*See generally id.*)

As the 911 dispatcher was speaking with Custis, she simultaneously added notes to the CAD system.  (ECF No. 49-2.)  The CAD notes largely reflected what Custis had reported to the 911 dispatcher: that several women were physically fighting, that one of the women had a gun, that one of the women had hit Custis and thrown him down the stairs, and that the gun was now with a black man with dreads wearing all black.  (*Id.* at 1–4.)  The notes also indicated that the group had moved outside, that there was an unknown vehicle associated with the group, and that the location of the black man with the gun was unknown.  (*Id.*)  The dispatch recording, which the responding officers reviewed before arriving at the scene of the incident, largely repeated this same information as well.  (*See generally* Motion Exhibit 2.)

Officers Kudela and Link arrived at the parking lot of the residence within 14 minutes of the 911 call and immediately observed a parked gray truck that was turned off in front of the residence.  (Motion Exhibit 4 at 8:09–8:15.)  The driver's door was partially open and the truck contained three occupants: (1) Johnson—who had short hair and was wearing yellow pants and a black polo shirt with red lettering on the back—was sitting in the driver's seat; (2) Johnson's wife—wearing a light orange dress—was sitting in the passenger seat; and (3) another woman—who Johnson referred to as his "sister"—was sitting in the backseat.  (*Id.*)

3

The officers immediately ordered Johnson and the two women to show their hands and asked, "Who's Chris?" (*Id.* at 8:20.)  Johnson and the women complied and said that "Chris" was inside the residence. (*Id.*)  The officers then asked if anyone in the truck had a gun. (*Id.* at 8:26.)  The occupants said "no." (*Id.* at 8:30.)  Nevertheless, the officers said they were going to have Johnson and the women exit the truck to be patted down. (*Id.* at 8:30–40.)  When Johnson's wife asked why, the officers explained, "Because someone is supposed to have a gun." (*Id.*)  Johnson responded, "Listen, no one has a gun at all.  I am just calming [the two women in the truck] down right now before we go back inside to go to sleep." (*Id.*)

Around that time, another patrol car arrived and two additional police officers, including an Officer Aspras, approached Johnson's truck.  Officers Kudela and Link reiterated that they were going to pat down the occupants, but before that occurred, the officers observed a black man with dreads, wearing all black, walk out of the residence and onto a sidewalk. (*Id.* at 8:49.)  Officers Kudela and Link approached and learned that the man was Custis. (*Id.* at 9:00–9:35.)  Officer Kudela immediately frisked Custis and determined he was unarmed. (*Id.*)  Officer Kudela asked Custis, "who has the gun," to which Custis replied, "a black guy with dreads." (*Id.* at 9:18.)  Custis said he did not know where that man was and added that he thought "they left." (*Id.*)  Officer Kudela asked Custis, "Was he wearing a polo shirt?"  Custis responded, "I think so, I don't know." (*Id.* at 9:20.)  Officer Kudela asked Custis if the man with the gun was in Johnson's truck. (*Id.* at 9:25.)  Custis said "no" but then immediately corrected himself: "I think that's them actually, in the car." (*Id.* at 9:37.)  Officer Kudela sought clarification: "Do they have a gun?" (*Id.*)  Custis replied, "I don't know." (*Id.* at 9:50.)

4

Meanwhile, the other officers, including Officer Aspras, stayed by Johnson's truck.  (*Id.* at 9:17–9:44.)  Johnson remained compliant with officer orders and asked the officers for time to try to calm down his wife down, who was crying and yelling.  (*Id.* at 1:00.)  The officers permitted Johnson to do so.  (*Id.*)  Then, after Officer Kudela learned that Custis was unarmed, Officer Aspras physically pulled Johnson out of his truck.  (*Id.* at 9:17–9:44.)  At that point, as Officer Aspras started to frisk Johnson, Officer Link immediately observed a gun in his pants.[3]  (*Id.*)  The officers handcuffed Johnson and moved him to a patrol car.  (*Id.*)  Johnson then identified himself and said that he was at the residence for a birthday party.  (*Id.*)

Ultimately, the officers searched Johnson's truck and found drugs and another gun therein.  (ECF No. 46 at 5.)  After learning that Johnson has prior felony convictions, the Government charged him with one count of Possession of a Firearm and Ammunition by a Prohibited Person.  § 922(g)(1).  Johnson now moves the Court to suppress the evidence found on his person and in the truck.[4]

## II.    PERTINENT PRINCIPLES

The Fourth Amendment prohibits unreasonable searches of "persons, houses, papers, and effects."  U.S. Const. amend. IV.  Still, "an officer may conduct an

---

[3] The parties disagree whether the officers immediately observed Johnson's gun when they removed him from his truck.  (ECF No. 52 at 6 n.3.)  Whether the gun was immediately observable is of no moment, however, because the bodycam footage makes clear that the officers did not see the gun until after they had physically removed him from his truck.  In other words, the officers would not have learned that Johnson had a gun on his person unless they first removed him from the truck, *i.e.*, seized him.

[4] Johnson does not ask for an evidentiary hearing (*see generally* ECF Nos. 46, 52) and the Government submits that one is not necessary (ECF No. 49 at 15).  Accordingly, the Court elects to decide the Motion on the papers.

investigatory stop, or '*Terry* stop,' if he 'has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Huerta*, 166 F.4th 866, 873 (10th Cir. 2025) (quoting *United States v. Samilton*, 56 F.4th 820, 827 (10th Cir. 2022), and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "During a lawful stop, 'an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous.'" *Huerta*, 166 F.4th at 873 (quoting *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018), quoting *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996)). "This principle also applies during a valid traffic stop,[5] thereby allowing an officer to order all passengers out of the vehicle and then frisk a passenger provided there is reasonable suspicion that the passenger is armed and dangerous." *Id.* (citing *United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019)).

"Reasonable suspicion is 'based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense.'" *Id.* (quoting *United States v. Garcia*, 751 F.3d 1139, 1143 (10th Cir. 2014), and *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007)). "We evaluate each factor alleged to support an inference of reasonable suspicion separately and in the aggregate." *Id.* (quoting *Gurule*, 935 F.3d at 885).

---

[5] Johnson's confrontation with the police cannot reasonably be viewed as having taken place in the context of a traffic stop. Although the interaction largely occurred while Johnson was in a truck, the officers found him when the truck was parked and turned off. In any event, whether this constituted a traffic stop is besides the point: The Government does not appear to dispute that the stop constituted an investigatory stop, which involves the same legal standards here. (*See generally* ECF No. 49.)

Because "[t]he primary purpose of a frisk is for officer safety," *id.*, "the officer-safety rationale can overcome even 'limited specific information leading law enforcement to believe that an individual was armed or dangerous,'" *Gurule*, 935 F.3d at 885 (citation omitted).  That said, the reasonable suspicion standard requires "more than 'an inchoate and unparticularized suspicion or hunch . . . .'" *Samilton*, 56 F.4th at 827 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)).

### III.    ANALYSIS

Johnson's contentions are twofold: (1) the initial detention was illegal because it was not supported by reasonable suspicion that criminal activity was afoot, and (2) the subsequent frisk was illegal because it was not supported by reasonable suspicion that he was armed and dangerous.  (*See generally* ECF No. 46.)  The Court agrees with Johnson's second contention and will therefore suppress the incriminating evidence found on his person and the truck.

At the outset, the Court notes that it need not decide whether the initial stop was lawful to resolve the Motion.  The Court assumes without deciding that it was because the officers reasonably suspected that at least one of the women in the truck had committed a crime (assault) in the residence.[6]  Nor is it necessary for the Court to decide whether the officers reasonably suspected that Johnson was armed to resolve the Motion.  The Court assumes without deciding that Custis's 911 call—wherein he

---

[6] The Court observes, however, that the bodycam footage did not appear to depict a woman matching the description of the woman Custis reported had assaulted him.  Recall that Custis told the 911 operator that a woman wearing all black with blue and white shoes had done so.  But the only woman visible in the bodycam footage—Johnson's wife—appeared to be wearing a light orange dress.

reported that a black man had a pistol—and Custis's subsequent encounter with Officers Kudela and Link—in which he equivocally indicated that the black man with the gun was in Johnson's truck—amounted to reasonable suspicion that Johnson was armed. *See Prost v. Anderson*, 636 F.3d 578, 599 (10th Cir. 2011) ("[T]he cardinal principle of judicial restraint is that if it is not necessary to decide more, it is necessary not to decide more.") (quoting *Morse v. Frederick*, 551 U.S. 393, 431 (2007) (Breyer, J., concurring in part and dissenting in part) (cleaned up)).

Even so, suppression would still be necessary in this case because the totality of the circumstances did not create reasonable suspicion that Johnson was dangerous. The Fourth Amendment requires such a showing. *See House*, 463 Fed. Appx. at 788 (requiring officers to reasonably believe "that the suspect is *both* (1) armed, and (2) dangerous") (emphasis in original).

The Court's conclusion is anchored in its review of the totality of the circumstances. Viewing those circumstances in the light most favorable to the Government, *United States v. Pena*, 115 F.4th 1254, 1258–59 (10th Cir. 2024), the Court concludes that the officers did not have enough information to suspect that Johnson was dangerous. Indeed, nothing in Custis's 911 call suggested that any of the male houseguests in the house, let alone Johnson specifically, had acted violently. Recall that Custis reported that a fight had broken out between his father and his female houseguests. Custis said that one of the women had assaulted him and thrown him down the stairs. And Custis averred that one of the women had pulled out a gun that, at some point, was held by a black man with dreads wearing all black.

8

Significantly, however, Custis never reported that any of the male houseguests were embroiled in or otherwise contributing to the fight. Nor did Custis ever allege that any of those individuals had brandished[7] a gun or threatened to use it. Thus, the 911 call did not create reasonable suspicion that any of the men were dangerous. And to the extent the 911 call did so, it at most only created such an inference with respect to a black man with dreads wearing all black. Johnson plainly did not resemble such a person: He had short hair and was wearing yellow pants. In other words, beyond being a black man, Johnson did not share any of the characteristics associated with the man who allegedly possessed a gun. *See United States v. Jones*, 998 F.2d 883, 885 (10th Cir. 1993) (discerning no reasonable suspicion where officers stopped two Black men in a black Mercedes solely based on a report that there were two armed Black men in a black Mercedes in the area). The following still from the bodycam video makes that clear:

---

[7] Although the Government claims that "a female party and a male party had both been seen handling a pistol," the Court does not understand Custis to have alleged that anyone, including the women, had brandished the pistol. (ECF No. 49 at 11.) The Court instead understands Custis to have alleged that a woman merely pulled out a gun. There is a difference between waving or brandishing a gun and merely pulling it out.



(ECF No. 46 at 3.)

Of course, there is no evidence that the police officers were personally privy to the 911 call, so they could not independently analyze the details of what Custis had said (or how he said it) to the dispatcher as they were emergently driving to the scene of the incident. The officers instead had to rely on the CAD notes and the dispatch report. But those sources did not suggest that Johnson was dangerous either. The notes and dispatch report only supplied abbreviated information about what Custis had reported to

the 911 operator:

**Event Activity**

| Entry Date | Unit ID | Status | Comments |
|---|---|---|---|
| 04 May 2025 03:28 | | | COMPLAINANT: S |
| 04 May 2025 03:28 | | | COMPLAINANT: R |
| 04 May 2025 03:28 | | | SEE MRE |
| 04 May 2025 03:30 | | | Y DK AND DRG |
| 04 May 2025 03:30 | | | DA AND FEMS ARE PHY FITINGRIGHT NOW |
| 04 May 2025 03:30 | | | UNK THE FEMS NME |
| 04 May 2025 03:30 | | | DAD IS CHRISTOPHER |
| 04 May 2025 03:30 | | | SROSE |
| 04 May 2025 03:30 | | | FEM HIT RP NAD NDAD ... THREW RP DOWN THE STAIRS ... FEMS WILL NOT LEAVE ... UNK IF HE NEEDS MEDICAL |
| 04 May 2025 03:30 | | | Y WEAP- FEMS HAVE A PISTOL ... DID NOT USE IT FEMS JUST HAVE |
| 04 May 2025 03:31 | | | 6-7 PEOPLE PHY FITING |
| 04 May 2025 03:31 | | | RP LOC- UPSTAIRS |
| 04 May 2025 03:31 | | | ALOT OF YELLING IN THE BG |
| 04 May 2025 03:31 | | | RP DAD IS O NTHE STAIRS RIGHT NOW |
| 04 May 2025 03:31 | | | RP IS TAMARUS |
| 04 May 2025 03:32 | 314 | EE | |
| 04 May 2025 03:32 | 314 | DU | |
| 04 May 2025 03:32 | 316 | DU | |
| 04 May 2025 03:32 | | | FEM WONT LEAVE |

(ECF No. 49-2.)  As illustrated above, the CAD notes indicated only that Chris *and the women* were acting violently.  As such, the officers could not rely on the CAD notes or the dispatch report in reasonably suspecting that Johnson was violent inside the residence and therefore somehow dangerous when they encountered him in the parking lot outside the residence.[8]

Thus, without such preliminary information, the officers could only have reasonably suspected that Johnson was dangerous if their personal interactions with

---

[8] Johnson insists that "[o]nly the information contained in the dispatch report is relevant to the Court's consideration of what the officers knew when they arrived" (ECF No. 52 at 2 n.1), whereas the Government asserts that "[o]fficers learned, via dispatch and CAD notes[,] that the reporting party said a pistol was involved but not used" (ECF No. 49 at 11).  For the purposes of its analysis, the Court assumes that the officers had access to the CAD notes and, in doing so, concludes that those notes do not create reasonable suspicion that Johnson was dangerous.

him at the scene of the incident created such an impression.  Those interactions did not do so.  The bodycam footage submitted by the parties reveals that Johnson was only polite and compliant with the officers' commands.  When they arrived at the parking lot outside Custis and Chris's residence, Officers Kudela and Link immediately ordered all of the truck's occupants to show their hands and asked, "Who's Chris?"  Johnson and the women complied with this order and answered the officer's question.  The officers then asked if anyone in the truck had a gun.  The occupants said "no."  Despite this answer, the officers informed Johnson and the women that they would be conducting a pat down "because someone is supposed to have a gun."  Johnson responded, "Listen, no one has a gun at all.  I am just calming [the two women in the car] down right now before we go back inside to go to sleep."

The Government submits that this last response by Johnson "heightened suspicion that he was armed" because it contradicted what Custis had reported to the 911 operator.  (ECF No. 49 at 12.)  Maybe so.  But Johnson's response still did not raise suspicion that he was dangerous.  It instead likely reflected an intent to conceal the fact that he possessed a gun unlawfully.  *See United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013) ("The existence of reasonable suspicion . . . is measured from the perspective of an objectively reasonable officer, not from the subjective perspective of the particular officer on scene.").  The animating purpose behind a frisk, however, is not to aid officers in collecting evidence for a later prosecution; rather, frisks are deployed to keep officers safe.  *Gurule*, 935 F.3d at 885.  Johnson's denial of anyone having a gun did not raise the specter that he was dangerous.  Notably, the

Government does not even argue that it did.  (*See id.* (arguing that Johnson's inconsistent response made it more likely that "*he was armed*") (emphasis added).)

What happened next did not generate reasonable suspicion either.  After Johnson said no one had a gun, the officers spoke with Custis, who at most merely suggested that Johnson *may* have a gun.  Such a statement—as meek and waffling as at it was—may have created reasonable suspicion that Johnson was armed.[9]  But Custis's statement did not create reasonable suspicion that Johnson was dangerous.  Absent specific circumstances indicating that a person is violent, the Tenth Circuit has made clear that mere gun possession does not inherently mean that a person is dangerous.  *See United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024) ("Moreover, if we are to take seriously the normative thrust of the Supreme Court's recent decision . . . then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way.") (citing *New York State Rifle & Pistol Association, Inc., v. Bruen*, 597 U.S. 1, 70 (2022) ("The constitutional right to bear arms in public for self-defense is not a 'second-class right . . . .'"))).

Tellingly, the Government does not devote much time analyzing the danger element of the reasonable suspicion standard in its Response.  (*See id.* at 12–15 (the Government's argument section on the armed and dangerous standard).)  Its argument

---

[9] Johnson urges the Court to discount Custis's statement to the police officers that Johnson may have been the man with the gun because Custis "had no way to see Mr. Johnson from the angle and distance he was standing away from him."  (ECF No. 52 at 7.)  Johnson's point is well-taken.  In any event, however, the Court assumes without deciding that the officers' initial detention and determination that Johnson was armed were legally sound.  So the Court need not opine further on the probative value of Custis's statement to the officers.

instead seems to focus on inferences that would lead to the conclusion that Johnson

was armed:

> Officer Link returned to the defendant's vehicle, aware that the person with the firearm had not been located and that the defendant may have been associated with the pistol. Collectively, the circumstances of the physical fight at that location, a pistol which still had not been located and Mr. Custis' statement 'I think that's them actually, them in the car,' would have given any reasonable officer cause to believe that the defendant could be armed and dangerous. *See United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010) (Reasonable suspicion determined by looking at 'totality of the circumstances' rather than assessing each factor or piece of evidence in isolation) (internal citations omitted).  Further, the defendant's statement to law enforcement that 'nobody has a gun' was entirely inconsistent with the 911 call and with Mr. Custis' confirmation that a male had a gun at some point during the altercation.  *The defendant's denial that anyone had a gun further heightened suspicion that he was armed.*

(ECF No. 49 at 12 (emphasis added).)

And again:

> Officer Link was contacting parties associated with a violent altercation, *and knew that both a female and a male had been reported to have a firearm*.  Officer Link also knew that the description of a male in black clothing with black dreadlocks appeared to match that of the reporting party, who was unarmed.  *Officer Link reasonably believed the defendant could be the person with the firearm.*  To afford the defendant the relief he seeks, the Court would need to be convinced that reasonably prudent officers in these circumstances would not have been warranted in believing that the defendant was armed and dangerous.  *United States v. Torres*, 987 F.3d 893, 904 (10th Cir. 2021).

(*Id.* at 13 (emphases added).)

The Court has already assumed without deciding that these facts amount to

reasonable suspicion that Johnson was armed.  But the Court still doesn't see how this

14

combination of facts adds up to reasonable suspicion that he was also dangerous.  *See United States v. Canada*, 76 F.4th 1304, 1307 (10th Cir. 2023) (concluding that officers may perform protective sweeps of "areas in which a weapon may be placed or hidden" if the police reasonably suspect that "a suspect poses a danger *and* may gain immediate access to a weapon") (emphasis added).  The Government does not supply a clear answer; instead, it collapses the armed and dangerous conditions into one analysis.[10]

Given this lack of clear argument, the Court is left to infer that the Government believes Johnson appeared to be dangerous because he was a "part[y] associated with a violent interaction."  (*Id.*)  The Government makes a species of this argument a number of different times throughout its Response.  (*See id.* at 9 (arguing that the initial detention was justified because it was "clear immediately that the defendant and the two female passengers *were related to the fight* described in the 911 call for service") (emphasis added); *see also id.* at 11 ("*The defendant's association with the two women was sufficient to indicate reasonable suspicion that he was armed and dangerous.*") (emphasis added); *id.* at 13 ("Officer Link was contacting parties *associated with a violent altercation*, and knew that both a female and a male had been reported to have a firearm.") (emphasis added).)

---

[10] The Government posits in the law section of its brief that, "while an officer must have reasonable suspicion that the individual was armed and dangerous, the elements are 'co-dependent,' such that 'suspicion that an individual is dangerous can affect . . . suspicion that the individual is armed, and vice versa.'"  (ECF No. 49 at 8 (quoting *Garcia*, 751 F.3d at 1143 n.7).)

But this is not an argument, let alone a developed argument, that Johnson's gun possession increased the chances he was dangerous.  The Government needed to do more than quote a footnote from a Tenth Circuit decision to convince the Court that the co-dependent nature of the "armed and dangerous" analysis created reasonable suspicion here, especially given all the recent caselaw making clear that they are distinct elements.

But this criminality-by-association argument is in tension with the Tenth Circuit's recent decision in *United States v. Williams*, — F.4th —, 2026 WL 741736 (10th Cir. March 17, 2026).[11]  There, police officers pulled over Williams (driver) and his girlfriend (passenger) in a residential, but high crime, area around 8:00 p.m. for failing to use a turn signal.  *Id.* at 1.  After receiving Williams's driver's license, the officers observed that his address listed a Denver detention facility.  *Id.* at 2.  Williams told the officers that he had been imprisoned for six years for violating the Colorado Organized Crime Act. *Id.*  When the officers returned to their patrol car, they discovered that "Williams had no valid driver's license, had two active municipal-court arrest warrants, had a history of charges involving violence and weapons, and had ties to the Crenshaw Mafia Bloods." *Id.* at 3.  As a result, the officers "handcuffed and arrested [Williams] on the municipal warrants" and "then moved him about thirty feet away near the patrol car and patted him down."  *Id.*  Meanwhile, the officers also frisked Williams's girlfriend, despite the fact that she had "a valid driver's license and no arrest warrants" and that she and Williams had been "silent, docile, and compliant."  *Id.*  The officers then conducted a protective sweep of Williams's girlfriend's car, which unearthed a loaded handgun lacking a serial number and bearing a gang stamp or sticker.  *Id.* at 4.

A federal grand jury charged Williams with being a felon in possession of ammunition.  *Id.*  Williams moved to suppress evidence of the firearm and ammunition, but the district court denied the motion.  *Id.*  The Tenth Circuit reversed.  In the Circuit's

---

[11] The Court notes that the *Williams* decision was announced after the briefing in this case had concluded.

view, Williams's appeal turned on "the reasonableness of detaining a passenger away from her car while the police conduct a protective sweep of the driver's area." *Id.* at 5. Indeed, the Circuit continued, "the officers could conduct a protective sweep of [the girlfriend's] car only if they had reasonable suspicion that she was armed and dangerous." *Id.* Contrary to the district court's conclusion, the Circuit rejected the notion that the girlfriend's "dating relationship with a gang-associated man like Williams supplied the required reasonable suspicion." *Id.*

In reaching this conclusion, the Circuit "credit[ed] the importance of officer safety" and agreed with the district court that the officers reasonably suspected that Williams's girlfriend may have been armed, as she could have "'gain[ed] immediate access to a weapon' that Williams might have hidden under the driver's seat." *Id.* at 6. With respect to the "dangerous condition," however, the Circuit "note[d] that the government did not even try to show [the girlfriend's] dangerousness apart from relying on her dating relationship with Williams." *Id.* While the Circuit acknowledged that this dating relationship might be one factor in the totality of the circumstances analysis, it went on to observe the following countervailing facts:

> (1) that [Williams's girlfriend] (and Williams) had been polite and cooperative throughout the stop, (2) that she was not under the influence of any intoxicants, (3) that she was not acting angry or upset, (4) that she voluntarily disclosed the dating relationship, (5) that she was a mother who had just dropped off her daughter at her sister's for the night, (6) that Williams had been released from prison three months earlier after being incarcerated for six years, (7) that she and Williams had just arrived back at his house, and (8) that she and Williams did not communicate after the officers removed Williams from the Impala.

17

*Id.* Based on all these circumstances, the Circuit declared that "[n]othing about [Williams's girlfriend] during the stop suggested a person ready to die in a shootout with four officers." *Id.* In other words, the Circuit concluded that the officers lacked reasonable suspicion to believe she was dangerous, and so it held that the protective sweep of her car was not lawful. *Id.*

This case bears material similarities with the *Williams* decision. Like that case, Johnson was polite towards the officers and obeyed their orders; the Government does not aver that he was under the influence of any intoxicants; his demeanor was calm and measured; and he voluntarily disclosed that he was married to the front seat passenger of his truck and that the backset passenger was his sister. On this last point, the Court emphasizes that Johnson appeared to be trying to actively cooperate with the officers, insofar as he asked the officers for more time to try to calm down his wife, who was visibly upset. *See United States v. McGregor*, 158 F.4th 1082, 1095 (10th Cir. 2025) (explaining that a defendant's conduct with the police "can be significantly probative concerning the issue of reasonable suspicion"). Notably, the officers granted Johnson's request for more time to calm down his wife. In the Court's view, a reasonable officer would not have acquiesced to such a request if they believed a suspect posed a present threat to their safety.

Furthermore, as explained above, the officers had no prior information that Johnson had personally participated in a crime on the night of the incident. In this way, Johnson and Williams's girlfriend were presumed dangerous based on the same faulty premise: because they were physically near and/or related to *other* people suspected of wrongdoing. But "[m]ere propinquity to others independently suspected of criminal

18

activity creates neither probable cause nor reasonable suspicion." *Huerta*, 166 F.4th at 874; *see also Daniels*, 101 F.4th at 778 ("That criminal activity might be afoot does not give police carte blanche to arrest everyone who happens to be nearby."); *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked*, even though that person happens to be on premises where an authorized narcotics search is taking place.") (emphasis added).

While the Court ordinarily defers to an officer's expertise in "distinguishing between innocent and suspicious actions," *Gurule*, 935 F.3d at 885 (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)), that deference "becomes inappropriate 'when an officer relies on a circumstance incorrigibly free of associations with criminal activity.'" *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (quoting *United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005)).

Resisting this conclusion, the Government posits that "[c]ourts have upheld the constitutionality of *Terry* stops and pat downs in" the following three ostensibly similar cases: *United States v. Goodrich,* 450 F.3d 552 (3d Cir.2006); *United States v. Raino,* 980 F.2d 1148 (8th Cir.1992); and *United States v. Fisher*, 597 F.3d 1156 (10th Cir. 2010). (ECF No. 49 at 14.) But the Government's reliance on these decisions is misplaced.

*Goodrich* concerned the propriety of an initial detention—it did not involve a frisk and so the armed and dangerous standard was inapposite. *See generally Goodrich,* 450 F.3d at 555–65. In *Raino*, police officers stopped a car that was parked near the site of a reported shooting. *Raino,* 980 F.2d at 1149. The officers frisked the defendant

19

in that case but only after observing that the defendant (1) started to "slowly pull away" his car from the officer's patrol vehicle; (2) "appeared to be nervous"; and (3) "reached behind the driver's seat with his right hand and appeared to be fumbling in the back seat for a few seconds." *Id.* No such facts are present here.

*Fisher* does not help the Government's case either. Again, the only issue on appeal there was whether an officer's "decision to detain the car was justified at its inception." 597 F.3d at 1158. Here, the dispositive issue is the frisk, not the initial detention. Second, the facts of that case are clearly distinguishable from those here. In *Fisher*, a police officer responded to a residence after someone reported via 911 that a "black male wearing a gold shirt" had "shot at her and her son." *Id.* at 1157. The officer "approached the only car parked in the driveway of the residence, which had its brake lights illuminated." *Id.* After the officer ordered the car's occupants to show their hands, the defendant "rolled down his window and stuck out his hands, revealing a gold sleeve." *Id.* After the defendant got out of the car, the officer "noticed the butt of a gun sticking out from under his seat." *Id.* Faced with all this information, the officer "immediately ordered the defendant to the ground, handcuffed him, and seized the gun." *Id.* In these circumstances, the Tenth Circuit upheld the detention, reasoning that "law enforcement was responding to a 9–1–1 call late at night, in a high crime area, with every reason to suspect gunplay, and the only vehicle at the scene looked as if it was about to depart." *Id.* at 1159.

By contrast, here, the Government does not allege that Custis and Chris's residence was in a high crime area or that Johnson's truck looked as if it was about to flee. On the contrary, Johnson's truck was turned off. More to the point, the defendant

20

in *Fisher* matched the description of the suspect who had been reported as committing the shooting in the 911 call.  To reiterate, Custis did not allege that any male houseguest had participated in the fight at his residence, nor provide a physical description that resembled Johnson beyond being the same race.  This, too, is not enough to show dangerousness.

In the end, the Court recognizes that some facts may have minimally suggested that Johnson was dangerous.  Although the Government does not analyze this fact in its Response, the officers responded to a call that occurred around 3:00 a.m.[12]  (*See generally* ECF No. 52.)  This contributes to a finding that criminal activity may be afoot. *See id.* (pointing out that the 911 call came "late at night").

But the Court does not see other evidence demonstrating dangerousness.  True, the officers had information that Johnson, his wife, and his sister were affiliated with the residence that was the subject of the 911 call.  But Johnson was never alleged to have acted violently during that incident.  He was also polite and compliant throughout his interaction with the police.  The officers knew nothing about Johnson's criminal history when they confronted him.  *Cf. United States v. Hammond*, 890 F.3d 901, 907 (10th Cir. 2018) (perceiving reasonable suspicion where the officers already knew that the frisked suspect was a gang member and a suspect in a prior weapons possession case, and

---

[12] Although the police officers did not know this until after they had detained and frisked Johnson—which is the relevant inquiry here—the Court notes that Chris's houseguests were at his home for a birthday party, which in other circumstances would mitigate the fact that the 911 call came in the middle of the night.  *See Daniels*, 101 F.4th at 782 (reasoning that, although a detention occurred "near midnight," the evening was the night of the Super Bowl, and "[a]n officer should have expected football fans celebrating (or commiserating about) the game's outcome late into the night").

had recently been arrested in connection with another weapons case); *Garcia*, 751 F.3d at 1144 (finding reasonable suspicion where officer had previously tasered a suspect and knew he had a criminal record); *United States v. Rice*, 483 F.3d 1079, 1081–82 (10th Cir. 2007) (the report from police dispatch mentioned that Mr. Rice was "known to be armed and dangerous" (quotations omitted)).  Without more, the Court concludes that the officers lacked reasonable suspicion to believe Johnson was dangerous.  Therefore, the frisk of his person and subsequent search of his truck were unlawful. *Williams*, 2026 WL 741736, at *1.

## IV.    CONCLUSION

For the foregoing reasons, the Motion is GRANTED.  (ECF No. 46.)

The Court will reset the Final Trial Preparation Conference and Jury Trial by way of separate Order.


Dated this 26th day of March, 2026.

BY THE COURT:

_____
William J. Martínez
Senior United States District Judge